1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**E-Filed 7/17/09**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

PATRICIA GALVIN,

                Plaintiff,

       v.

PROVIDENT LIFE AND ACCIDENT
INSURANCE COMPANY, as Administrator and
Fiduciary of the Group Long Term Disability Plan
for Heller, Ehrman, White & McAuliffe; and THE
GROUP LONG TERM DISABILITY PLAN FOR
HELLER, ERHMAN, WHITE & MCAULIFFE,

                Defendants.

Case Number C 07-5195 JF (RS)

**ORDER[1] RE CROSS-MOTIONS
FOR SUMMARY JUDGMENT**

Re. docket nos. 30 & 35

      Patricia Galvin ("Galvin") is a fifty-four-year-old former tax attorney who last worked for

the now-defunct law firm of Heller Ehrman McAuliffe & White ("Heller Ehrman").  She seeks

ERISA disability benefits on the ground that increasingly severe pain caused by two automobile

accidents in 2000 and 2001 prevents her from performing her job.  The administrator of Heller

Ehrman's ERISA plan rejected her claim.  The rejection was upheld on appeal by the plan's

---

[1] This disposition is not designated for publication in the official reports.

1  insurance carrier, UNUM Provident Life and Accident Insurance Company ("UNUM"), acting as

2  an ERISA fiduciary.

3       Galvin has been examined and treated by numerous physicians, many of whom have

4  documented her pain, and none of whom has questioned its existence or believed it to be less

5  severe than Galvin herself has described it.  Nonetheless, throughout its lengthy administrative

6  decisionmaking and review process, UNUM consistently has rejected Galvin's claim as

7  unsubstantiated by objective medical data.  In many instances, UNUM's claims administrators

8  have taken the position that Galvin's difficulties were caused by depression and a "hostile work

9  environment" during her tenure at Heller Ehrman.  UNUM was not without some basis for

10  several of its concerns with respect to Galvin's claims.  However, having undertaken a careful

11  review of the lengthy administrative record in this case, the Court finds sufficient evidence to

12  support the conclusion that Galvin was disabled under the terms of the Heller Ehrman plan at all

13  times relevant to her claims.  Accordingly, judgment will be entered in her favor.

14                                         **I. BACKGROUND**

15       Galvin has worked in the legal profession for nearly thirty years.  She began her career at

16  a law firm in New York, worked as an Assistant United States Attorney for the Eastern District

17  of New York from 1984 through 1986, was employed by the Securities and Exchange

18  Commission until 1991, operated her own tax law practice until 1995, and began work as a tax

19  associate at Heller Ehrman in 1996.  In her employment review for the year 2000, it was noted

20  that Galvin was "extremely bright and well respected by her colleagues" and a "valued member

21  of the Tax Department."  AR 1476.[2]  Galvin was to be considered for admission as a shareholder

22  of the firm on January 1, 2002.  AR 1476.

23       Galvin's present medical difficulties largely began in 2001.  On February 12 of that year,

24  while stopped at a traffic light, Galvin's vehicle was hit from the rear by another vehicle

25  traveling at a high rate of speed.  AR 344.  While her vehicle was able to be driven away from

26  _____

27       [2] The administrative record consists largely of documents bearing a Bates Stamp of
     PLACL 2003 LTD.  For convenience, the Court will refer to those documents using the
28  abbreviation "AR."

Case No. C 07-5195 JF (RS)
ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT
(JFLC3)

the scene, Galvin experienced considerable pain following the incident.  On February 21, 2001, she had a consultation with Dr. Le Baron, who noted her complaints of back and neck pain and referred her to physical therapy.  AR 211.  Her physical therapy records indicate that she continued to experience headaches as well as neck, shoulder, and low-back pain over the next several months.  AR 211-220.

On July 13, 2001, Galvin saw her treating physician at Stanford Hospital, Dr. Richard Lee, who noted her complaints of "chronic bilateral neck pain . . . that . . . does not seem to resolve spontaneously, [that] has been intermittently exacerbated[,] and [that] seems to be greatly exacerbated lately."  AR 224.  Dr. Lee noted that Galvin had a significantly "decreased range of motion in forward flexion and rotation and significant spasm in her left shoulder, yet worse in the right, with some radiation pain down her right arm."  AR 224.  An examination of Galvin's neck revealed a "marked paravertebral spasm."  AR 225.  Dr. Lee diagnosed Galvin with "rather pronounced thoracic outlet syndrome"[3] and gave her instructions for home physical therapy to build on her prior experiences in clinical physical therapy.  AR 226.

On November 27, 2001, Dr. Lee again examined Galvin for neck pain that was "ongoing since her motor vehicle accident early this year."  AR 227.  Dr. Lee noted that Galvin was experiencing "neck and back spasms, not improved with home physical therapy," and that he had "considerable concern about how chronic pain is a consequence of the motor vehicle accident and has altered her posture and left her with low back asymmetry."  AR 228.  Dr. Lee ordered x-rays and made several referrals for expert consultation.  AR 228.  Shortly thereafter, on February 21, 2002, Galvin saw Dr. Fredericson at Stanford Hospital.  He observed that Galvin appeared to be experiencing "cervical myofascial pain with cervical facet dysfunction" and "lumbar myofascial pain with lumbar facet dysfunction."  AR 231.  Dr. Fredericson ordered MRIs and an EMG.  The results of an initial MRI of Galvin's cervical spine were not dramatic, but did document three herniated discs.  AR 234.  A second MRI revealed further disc protrusion.  AR

---

[3] Thoracic outlet syndrome involves compression at the superior thoracic outlet that affects the nerves passing from the neck into the arms.

1    175. The EMG indicated that Galvin was not suffering from radiculopathy. On March 4, 2002,

2    Galvin saw Dr. Gamburd on a referral from Dr. Lee. Dr. Gamburd examined Galvin and her

3    medical files and concluded that Galvin was experiencing upper and mid-cervical mechanical

4    pain, bilateral shoulder instability and secondary impingement syndrome, and right lumbar

5    mechanical pain. Dr. Gamburd referred Galvin to physical therapy.

6         Galvin continued to seek treatment during the remainder of 2002, but the few

7    improvements she experienced were short-lived. Her productive capacity had begun to lag as a

8    result of interference from the pain she was suffering. For example, her billable hours declined

9    from 1,861 hours in 2000 to 1,265 hours in 2002, AR 1693-98–approximately a third–and her

10   claimed sick leave increased from 90 hours to 178.8 hours during the same period, *id*. On

11   January 8, 2003, Galvin saw Dr. Lee, who noted that "things ha[d] taken a turn for the worse" in

12   that Galvin's recurring "episodes of thoracic outlet syndrome with neck and shoulder pain

13   occasional[ly] radiating to the lateral chest and arms . . . . ha[d] come back with a vengeance."

14   AR 481. Dr. Lee ordered Galvin to stop working until her symptoms improved. At that time,

15   Galvin made a claim for disability benefits under Heller Ehrman's ERISA plan. UNUM treated

16   the claim as one for short-term benefits and approved benefits through February 8, 2003. Galvin

17   again was seen by Dr. Lee on April 8, 2003. Dr. Lee noted primarily that Galvin's neck,

18   shoulder, back, and radiating hip pain had not improved materially. AR. 486. Specifically,

19   Galvin had "made extremely slow progress with physical therapy[,] although she ha[d] been

20   extremely diligent" in that respect. AR 486.

21        Under these medical circumstances, and given that UNUM had approved her disability

22   benefits only through February 2003, Galvin pressed UNUM for further coverage. On April 29,

23   2003, she had a telephone interview with an UNUM representative in connection with her claim,

24   explaining that she "could not lift up her right shoulder without causing her arm to go numb."

25   She also explained that she was unable to sit for more than one hour without her pain becoming

26   acute, and that she had trouble turning her neck. Subsequently, in a supplemental statement sent

27   to UNUM on May 19, 2003, Galvin stated: "The pain in my neck, right shoulder, right arm,

28   upper back, right side and hip and the numbness in the right arm and hand prevent me from

4

1   sitting or working at the computer for any length of time." AR 39.  On June 20, 2003, one of

2   Galvin's therapists, back-pain specialist Esther Gokhale, faxed UNUM ten pages of medical

3   records from January 29, 2003 forward.  The records detailed Galvin's complaints of headache,

4   her difficulties walking, and pain in her right shoulder, trapezius, hip, and lower back.  AR

5   74-82.  UNUM reviewed all of the material in Galvin's file and, while not disputing the medical

6   diagnoses of pain, concluded that the proffered material "did not support restrictions and

7   limitations beyond February 8, 2003."  There is no indication as to how UNUM arrived at this

8   conclusion.

9          On July 16, 2003, Galvin faxed UNUM approximately seventy pages of additional

10   medical documentation, including her MRI results showing disc herniation, and medical records

11   from a number of her treating physicians and health care providers.  These records documented

12   Galvin's complaints of pain and migraines, and her doctors' observations of neck and back pain,

13   right shoulder impingement syndrome, increasingly frequent and severe bilateral hip pain, and

14   decreased cervical range of motion.  AR 164-243.  UNUM nonetheless denied the claim,

15   apparently on the grounds that (1) the restriction of no-work pending improvement of symptoms

16   was not supported by the medical information in the file, (2) even though Galvin had been taken

17   out of work by Dr. Lee, she continued actively to interview for jobs, including in New York City,

18   and (3) there was some indication that Galvin had been "working on a case" in February 2003.

19   AR 319-325.  With respect to the medical basis for the restrictions and limitations ordered by Dr.

20   Lee, UNUM did not provide any discussion as to why the documentation provided by Galvin's

21   health care professionals of pain and corresponding inability to concentrate did not adequately

22   support the restrictions.  *Id*.  UNUM concluded that "work-related issues appear to be the driving

23   factor to leave work," but did not explain what these factors were, or whether or not they were

24   caused by Galvin's decreased ability to function as an attorney as a result of her pain.

25          On January 4, 2004, Galvin returned to work with the cautious approval of her treating

26   physicians.  She also continued to pursue her claim for benefits during the period of her disability

27   leave, filing a timely administrative appeal on February 21, 2004.  In the appeal, she explained

28   and documented, using cell phone records, that she never traveled to New York City during the

5

1  period in question, and that she did not interview for jobs.  She also explained that the case she

2  was "working on" during the disability period was a negligence action against the driver of the

3  vehicle that collided with her own on February 12, 2001.  Her "work" consisted of gathering

4  medical records for disclosure to the defendant.  AR 336.  Once again, Galvin also described her

5  physical difficulties in substantial detail.  AR 343.  With respect to UNUM's belief that her

6  difficulties were primarily work-related, she provided a recent assessment by Dr. Lee, who

7  stated:

8  > There still remain[] some issues regarding the reasons for her disability, and I am
   > concerned because several statements were taken out of context from her record

9  > by an outside disability insurance provider that seem to indicate that she was
   > trying to claim psychologic disability.  This was never my impression.  I felt that

10 > her predominant injuries were myofascial in nature.  However, they were not
   > improved by a heavy workload or work environment that was sometimes hostile

11 > as far as understanding of the time she needed away from work to get her specific
   > treatments and diagnostic workups. . . .  [I]t is important to be clear that her

12 > reasons for disability were medical, primarily musculoskeletal and neurologic.
   > Whatever issues she may have secondary to that were not disabling to her or in

13 > any major way responsible for her being unable to work.

14 AR 552.  Dr. Lee then reiterated his musculoskeletal findings, which had not changed materially.

15      Galvin also submitted for consideration the opinion of Dr. Curtis Turchin, a chiropractor

16 recommended by Galvin's Stanford physicians.  Dr. Turchin observed that

17 > Galvin's injuries [had] worsened gradually but steadily since the accident and, as
   > a result, her pain had also increased over that time.  For example, a very

18 > significant amount of connective tissue fibrosis had formed over time along the
   > right side of her cervical spine and down to her lumbar spine, causing pain along

19 > the right spine radiating all across the right side of her back, her right hip[,] and
   > right buttock.

20

21 AR 597.  Dr. Turchin specifically noted that Galvin's pain was "mechanical" in nature and

22 "directly tied to injuries," such that he could "observe it upon palpation and orthopedic testing."

23 *Id*.  Dr. Turchin continued that in his judgment,

24 > by the last few months of 2002 and into 2003, Ms. Galvin's injuries had worsened
   > to the point where they impaired her ability to work and even to concentrate.  For

25 > the first 4 months of her treatment with me her neck injuries caused her to suffer
   > debilitating headaches that radiated up into the back of her head, sometimes on

26 > both sides.  Those headaches were triggered by, among other things, sitting for
   > any length of time, using her right arm or moving her shoulder repeatedly.  She

27 > could not bend or walk upstairs without moderate to severe pain.  She suffered
   > from moderate pain along the front of her right shoulder.

28 AR 598.  Dr. Turchin concluded that "Ms. Galvin's progress was very slow because of the extent

6

and severity of her injuries.  In my judgment, Ms. Galvin was not able to work until mid-January 2004 when her condition had improved to the point that, with work restrictions, she could attempt gradually getting back into her work routine." *Id.*

UNUM's Dr. Stephen Jacobson reviewed Galvin's claim, issuing a report dated April 26, 2004.  Dr. Jacobson found that Dr. Lee's no-work restriction was not supported by medical evidence.  Specifically, he took issue with the lack of "clinical findings or tests such as a mini-mental status examination that [might] document cognitive functional impairment to support cognitive [restrictions and limitations]."  AR 614.  He noted that the clinical findings of Galvin's care providers were not "consistent."  Dr. Jacobson found that the only "consistent" findings were that Galvin suffered from limited range of motion in her neck, thoracic spine, and lumbar spine, suggesting that relatively minimal restrictions would suffice.  Dr. Jacobson also noted that Galvin was able to drive on April 29, 2003, indicating that she could "move her head and cervical spine."  AR 615.  Dr. Jacobson again highlighted the possibility that other factors–depression and a "hostile work environment"–were to blame for Galvin's difficulties. AR 615.  Dr. Jacobson took issue with Dr. Lee's diagnoses, stating that there were insufficient corroborative symptoms in the medical record to credit them.  AR 615.  Finally, Dr. Jacobson noted Dr. Turchin's conclusions and stated, without explanation, that they supported only limited restrictions and limitations.  AR 615.

Consistent with Dr. Jacobson's findings, UNUM upheld its earlier denial of disability benefits, stating:

> Your occupation as an Attorney does not require lifting over 20 pounds and you
> have the ability to change positions frequently, and you are able to take micro
> breaks during the day.  Therefore, it does not appear restrictions and limitations
> exist which would preclude the performance of your occupation.

AR 626.  The denial letter does not reflect any consideration of Galvin's subjective complaints, or of the documented worsening of her symptoms between February 2001 and January 2003. The letter also contains no discussion of the mental and intellectual demands of Galvin's job as a tax attorney, and of whether she reasonably could be expected to perform them given the persistent radiating pain and headaches that her health care providers noted she was experiencing.

7

1    Galvin continued to work during the period while her appeal was pending, but as of early May

2    2004, her condition appeared to worsen and she felt unable to remain in her employment.  In

3    mid-May of 2004, Galvin requested further disability benefits and did not subsequently return to

4    work.  On February 2, 2005, Heller Ehrman terminated Galvin.

5    　　　On April 20, 2005, in connection with an employment discrimination action brought by

6    Galvin against Heller Ehrman on the basis of its alleged failure reasonably to accommodate her

7    disability, Galvin was examined over the course of two hours by Karen Montalbano, D.C., who

8    also undertook a five-hour review of Galvin's medical records in connection with the

9    examination.  Dr. Mantalbano's physical testing identified pain in multiple areas of Galvin's

10   cervical and lumbar spine and revealed a diminished pulse in her right arm when elevated.  Dr.

11   Mantalbano also noted hyperesthesia of the right forearm, abnormal movement of the ribs, and

12   hip pain.  Dr. Mantalbano diagnosed Galvin with cervical discopathy/radiculitis, and lumbar

13   discopathy.  AR 692-700.  She also agreed with an earlier diagnosis by Dr. Turchin that Galvin

14   was suffering from Ehlers Danlos Syndrome, a condition which impedes the healing of

15   connective tissue injuries.  Dr. Mantalbano considered Galvin permanently disabled and stated

16   that "[b]ecasue of this condition [Ehlers Danlos Syndrome] it is clear why this woman has not

17   been able to heal from her automobile accident trauma."  AR 698.  She concluded that Galvin

18   had a "permanent disability and . . . [was] unable to return to work in her current capacity from a

19   non-industrial cause."  AR 699.

20   　　　On June 8, 2006, Galvin received an independent medical examination by L. Neena

21   Madireddi, M.D.  Dr. Madireddi's impression was that Galvin suffered from "multilevel cervical

22   and lumbar discogenic disease, right shoulder impingement syndrome, chronic myofascial pain

23   disorder, a history of major depression, and chronic pelvic pain."  Dr. Madireddi stated:

24   　　　　　Ms. Galvin is clearly unable to work full-time as a Tax Attorney. She indicates
　　　　　she may be able to work 10 to 15 hours per week with adequate work
25   　　　　　modifications, which include voice activated software and entirely ergonomic
　　　　　setup with ability to change positions and limited lifting, stooping and reaching.
26   　　　　　However, I do not believe that such a position is likely to exist in the competitive
　　　　　workplace. Moreover, I believe her musculoskeletal impairments preclude her
27   　　　　　from any consistent gainful employment in even a sedentary capacity.

28   AR 732-33.

8

Galvin also was examined by Dr. Melvin Britton, a distinguished rheumatologist, "as a consultation to her treating physician Dr. Richard Lee" and at the request of her attorneys in related litigation against Stanford and UNUM for allegedly disclosing her medical records in violation of her privacy rights. Dr. Britton's examination revealed multiple tender points in the area of Galvin's neck and shoulders and radiating neck pain that limited her range of motion. AR 1669. Examination of her arms and legs revealed evidence of hyperextensibity consistent with a diagnosis of Ehlers Danlos Syndrome. AR 1969-71. Dr. Britton made the following comments in relation to Galvin's ability to work:

> The further question then [be]comes whether this lady can work and I do not think she can. It would be extremely difficult in any tax law practice to make the accommodations necessary for her to work on an intermittent basis and my own impression of life in that kind of a pressure cooker would be that she would become increasingly miserable as she will face the fact that she could not keep up or do the work that she had. I think that she is, in the terminology of the QME world, permanent and stationary and that there will be no change unfortunately in her inability. I would point out that her past history of high achievement argues strongly against this being anything other than what it appears to be, that is a condition which came on and which has a relationship to her Ehlers-Danlos syndrome and which is at this time going to be a permanent fixture of her life. I do not think that much in the way of treatment is valuable to her . . . .

AR 1669-72.

Galvin submitted the foregoing medical evaluations and her complete prior file to UNUM as part of a claim reassessment initiated in 2006 pursuant to the terms of a settlement between UNUM and the State of California (the California Settlement Agreement, or "CSA"). Upon reviewing the evidence, UNUM's Dr. Thomas Davis concluded that there was "no evidence of cervical or lumbar spine injury[,] . . . no evidence of motor or sensory deficits as a result of [the] [motor vehicle accidents] in 2000 or 2001[,] [and that] laboratory studies, radiologic examinations, and electrodiagnostic studies following the event are not supportive of serious continuing musculoskeletal injury." AR 2392. It appears that Dr. Davis was referring specifically to Galvin's EMG and MRI results, which revealed, respectively, that Galvin likely was not suffering from radiculopathy or severe disc herniation. *Id*. Summarizing his conclusions, Dr. Davis stated that "[t]he findings on examination do not correlate with the degree of symptomatology reported by the patient." AR 2393. Around the same time, UNUM rejected

9

1   Galvin's second request for disability benefits, finding that Galvin's coverage in 2004 was

2   eliminated by a "pre-existing disability" provision in the Heller Ehrman plan.

3                                    **II. LEGAL STANDARDS**

4          Summary judgment is appropriate when there are no genuine and disputed issues of

5   material fact and the moving party is entitled to prevail as a matter of law. Fed. R. Civ. P. 56;

6   *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The Court must view the evidence in the

7   light most favorable to the non-moving party, and all reasonable inferences must be drawn in

8   favor of that party.  *Torres v. City of Los Angeles*, 540 F.3d 1031, 1039-40 (9th Cir. 2008).  The

9   moving party bears the burden of showing that there is no material factual dispute.  Therefore,

10  the court must regard as true the opposing party's evidence, if supported by affidavits or other

11  evidentiary material. *Celotex*, 477 U.S. at 324.  If a genuine dispute of material fact exists, the

12  Court may "try" the case on the administrative record and enter judgment pursuant to Federal

13  Rule of Civil Procedure 52(a).

14                                   **III. DISCUSSION**

15  **A. Standard of Review**

16         Under the Supreme Court's decision in *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S.

17  101 (1989), a "denial of benefits challenged under [29 U.S.C.] § 1132(a)(1)(B) is to be reviewed

18  under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary

19  authority to determine eligibility for benefits or to construe the terms of the plan." *Sandy v.*

20  *Reliance Standard Life Ins. Co.*, 222 F.3d 1202, 1204 (9th Cir. 2000) (citation omitted).  Thus,

21  "the default is that the administrator has no discretion, and the administrator has to show that the

22  plan gives it discretionary authority in order to get any judicial deference to its decision."

23  *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1089 (9th Cir. 1999).  Before determining whether

24  language in a plan confers sufficient discretion upon the plan administrator, however, courts

25  frequently must determine "what constitutes 'the plan' for purposes of ERISA," a question as to

26  which confusion is "all too common."  *Sperandeo v. Lorillard Tobacco Co., Inc.*, 460 F.3d 866,

27  870 (7th Cir. 2006) (quoting *Health Cost Controls of Ill., Inc. v. Washington*, 187 F.3d 703, 712

28  (7th Cir. 1999)).

1    In the instant case, the determination of whether the plan confers sufficient authority upon

2    the plan administrator is complicated by the presence of no fewer than six documents in the

3    administrative record that appear to constitute "the plan," and to which the parties refer as such.

4    *See* PLACL 2000 LTD 43-75; PLACR 304-330; PLACR 331-372; AR 91-123; AR 883-913; AR

5    2418-2448.  One of these documents in fact is the original insurance policy, *see* PLACL 2000

6    LTD 43-75, while the other five are certificates of insurance.  The policy contains the following

7    provision, entitled "Allocation of Authority":

8
         Except for those functions that this Policy specifically reserves for the
9        Policyholder, the Policyholder delegates and agrees that we shall have full,
         exclusive, and discretionary authority to control, manage, and administer claims,
10       and to interpret and resolve all questions arising out of the administration,
         interpretation, and application of this Policy.  Our authority includes, but is not
11       limited to, the following: 1. the right to resolve all matters when a review has been
         requested; 2. the right to establish and enforce rules and procedures for the
12       administration of this Policy and any claim under it; and 3. the right to determine:
         a. eligibility for coverage; b. entitlement to benefits; c. amount of benefits
13       payable; and d. the sufficiency and amount of information we may require to
         determine a, b, or c.  Subject to the review procedures of this Policy, any decision
14       we make in the exercise of our authority is conclusive and binding.

15   PLACL 2000 LTD 00048.  Because it says both "in sum [and] substance that the plan

16   administrator or fiduciary has authority, power[,] or discretion to determine eligibility or to

17   construe the terms of the plan," *Sandy*, 222 F.3d at 1207, this language, if given controlling

18   effect, would require deferential review.

19   Turning to the five certificates of insurance, two categories emerge with respect to the

20   presence of discretionary language.  Two of the certificates provide that in an appeal of claim

21   denial, the Claims Fiduciary shall have

22       sole and exclusive discretion and power to grant and/or deny any and all claims
         for benefits, and construe any and all issues relating to eligibility for benefits. All
23       findings, decisions, and/or determinations of any type made by the Claims
         Fiduciary shall not be disturbed unless the Claims Fiduciary has acted in an
24       arbitrary and/or capricious manner. Subject to the requirements of law, the Claims
         Fiduciary shall be the sole judge of the standard of proof required in any claims
25       for benefits and/or in any question of eligibility for benefits. All decisions of the
         Claims Fiduciary shall be final and binding on all parties. Whenever a decision on
26       a claim is involved, the Claims Fiduciary is given broad discretionary powers, and
         the Claims fiduciary shall exercise said powers in a uniform and
27       nondiscriminatory manner in accordance with the Plan's terms.

28   AR 121; *see also* PLACR 306.  This language also unambiguously confers sufficient

11

1 discretion on the plan administrator under *Sandy*.

2     Three of the certificates, however, lack any language that could be interpreted to

3 confer sufficient discretion on the administrator.[4]  As Galvin observes, the two

4 "discretionary" certificates–including the one upon which UNUM places exclusive reliance

5 in its papers in arguing for a deferential standard of review–have an effective date of January

6 1, 1998, whereas the three "non-discretionary" plans contain not only an effective date of

7 January 1, 1998, but a revision date of January 1, 2003.  *See* PLACR 370; AR 885; AR 2420.

8 Galvin filed her disability claim on January 8, 2003, shortly after the revised certificates were

9 issued, at least suggesting that the plan administrator's discretion had been eliminated from the

10 plan in effect at the time her claim accrued.

11     In determining which of these potential "plans" controls, the Court must consider both the

12 significance that ordinarily attaches to each category of document and the requirements of clarity

13 and notice that must be satisfied before a court will deviate from the default *de novo* standard of

14 review.  The case law offers no clear formula in this respect.  For example, while the Seventh

15 Circuit in *Ruiz v. Continental Cas. Co.*, 400 F.3d 986, 991 (7th Cir. 2005) was at pains to explain

16 that the insurance policy underlying a plan even *may* be considered a "plan document," the court

17 only a year later in *Sperandeo* referred to the insurance policy as "the basic plan document," as

18 among the policy, several certificates of insurance, and a summary of plan description, 460 F.3d

19 at 871.[5]

20

21 _____

22    [4] The three "non-discretionary" plans do state that "Proof of Loss means written
evidence satisfactory to us that you are Disabled and entitled to LTD Monthly Benefits."  *See*

23 AR 2443.  But under *Kearny* and *Sandy*, the use of the phrase "satisfactory to us" to describe the
quantum of proof required to state a claim for benefits does not confer sufficient discretion to

24 warrant deferential review.  *See Sandy*, 222 F.3d at 1204; *Kearny*, 175 F.3d at 1089-90.

25    [5] Similar confusion exists with respect to the significance of so-called summary plan
descriptions ("SPDs").  Some courts have held that "[t]he language of the plan is what controls; a

26 summary plan description cannot be used to expand discretion given under plan," *Akhtar v.
Cont'l Cas. Co.*, No. 01 C 7109, 2002 WL 500544, at *4 (N.D. Ill. April 1, 2002) (citing *Health

27 Cost Controls of Illinois*, 187 F.3d at 711), while others have stated plainly that although a policy
does not contain a clause granting discretion to the Plan Administrator, "[t]his fact . . . is not fatal

28 to [the insurer's] argument because when the SPD conflicts with the Policy, the SPD controls."

1   A review of the case law reveals that in determining whether a plan administrator retains

2   sufficient discretion to warrant deferential judicial review, the focus is less on a putative

3   hierarchy of documents than on whether an employee "[has] be[en] told in clear terms that the

4   administrator reserves the authority to construe terms in the plan." *Ruttenberg v. U.S. Life Ins.*

5   *Co. in City of New York*, 413 F.3d 652, 659 (7th Cir. 2005) (citing *Herzberger v. Standard Ins.*

6   *Co.*, 205 F.3d 327, 333 (7th Cir. 2000)).  Thus, in *Heidgard v. Olin*, the Second Circuit gave

7   controlling effect to the non-discretionary terms of a "booklet" distributed by a company to its

8   employees, because "only the Booklet, not the Plan itself, was distributed to employees," and

9   "[t]he Booklet purported to summarize the Plan."  906 F.2d at 907.  Facing the opposite situation

10  in *Sperandeo*, in which the Policy lacked discretionary language but several certificates of

11  insurance and summary plan descriptions ("SPDs") contained such language, the Seventh Circuit

12  emphasized that the "lack of discretionary language in the policy itself, coupled with explicit

13  language of the Certificate and the SPD that they are not part of the policy," precluded the

14  application of a deferential standard of review.  460 F.3d at 872.  Finally, in *Ruttenberg*, where

15  discretionary language was present in an employer's application for group insurance, known as a

16  Master Application, the court focused on the lack of discretionary language in documents such as

17  the SPD and a certificate of insurance to hold that the language in the Master Application did not

18  warrant application of an abuse of discretion standard.  413 F.3d at 659-60.

19  In the instant case, the relevant documents "present[], at the very least, the sort of opaque

20  situation that bars . . . the application of [a] deferential . . . standard of review."  *Sperandeo*, 460

21  F.3d at 872.  While it is true that the certificates state that they are "not the contract of

22  insurance[,] . . . [but] evidence of insurance under the policy," their combined effect is to obscure

23  the discretionary language contained in the policy.  Notably, each certificate represents that it

24  "summarizes the provisions of the Policy *as they may affect you*."  *See* PLACR 370; AR 885; AR

25  2420 (emphasis added).  As the Second Circuit has observed, whether a plan confers sole

26  discretion upon the administrator, thus altering the standard of review applied by the district

27  ────────────

28  *Gibbs ex rel. Estate of Gibbs v. CIGNA Corp.*, 440 F.3d 571, 575 n.7 (2d Cir. 2006) (citing
*Heidgerd v. Olin Corp.*, 906 F.2d 903, 907-08 (2d Cir. 1990)).

1   court, clearly "affects" a participant in that it shapes the scope of the participant's rights: "The

2   very existence of 'rights' under [ERISA] plans depends on the degree of discretion lodged in the

3   administrator.  The broader that discretion, the less solid an entitlement the employee has and the

4   more important it may be to him, therefore, to supplement his ERISA plan with other forms of

5   insurance." *Gibbs*., 440 F.3d at 577-78 (quoting *Herzberger*, 205 F.3d 331).  Here, the relevant

6   "evidence of insurance under the policy"–namely, the certificates of insurance that appear to

7   reflect a revision of the plan predating the accrual of Galvin's claim–lacks discretionary

8   language, and a plan participant or beneficiary would have no reason to suspect that language

9   buried in the original policy was controlling.

10      Relatedly, the fact that UNUM included explicit discretionary language in certificates of

11  insurance with an effective date of January 1, 1998–language that largely tracks that of the policy

12  itself–but removed such language from the revised certificates strongly suggests the absence of

13  continuing discretion.  Under these circumstances, it is impossible to conclude that UNUM has

14  carried its burden of demonstrating that an abuse of discretion standard should apply.

15  Accordingly, the Court will apply a *de novo* standard.[6]

16  **B.      Disability**

17      To prevail on her claim for benefits, Galvin must demonstrate that she was "totally

18  disabled" under the Heller Ehrman plan at all relevant times.  The plan defines "total disability"

19  as: (1) inability "to earn at least 80% of your Own Occupation Income Level"; or (2) inability "to

20  perform each of the material duties of the occupation that you regularly perform for the

21  Employer, or, if a physician or an attorney, [inability] to perform each of the material duties of

22  your specialty in the practice of medicine or law."  AR 2431.[7]  In assessing whether the record

23

24      [6] Galvin also argues that *de novo* review is warranted on the basis of the aforementioned
    California Settlement Agreement, pursuant to which UNUM agreed to eliminate the use of

25  "discretionary" clauses that would warrant judicial review under the abuse of discretion standard.
    However, the CSA expressly states that "[d]iscretionary authority provisions in existing

26  California Contracts that were issued prior to the date of the Order of the Commissioner are not
    affected by the CSA."  Since the subject plan predates the CSA, any discretionary language is

27  unaffected.

28

        [7] The various versions of "the plan" contain a uniform definition of "total disability."

1   submitted to UNUM warrants a finding that Galvin was disabled under the terms of the Plan, the

2   Court will apply the prospective claim reassessment rules that were imposed upon UNUM

3   pursuant to the California Settlement Agreement.  Of particular relevance here is the CSA's

4   provision entitled "Attending Physician's Opinion."  The provision states that UNUM

> shall give *significant weight* to an attending physician's opinion, if the attending
> physician is properly licensed and the claimed medical condition falls within the
> attending physician's customary area of practice, *unless* the attending physician's
> opinion is not well supported by medically acceptable clinical or diagnostic
> standards *and* is inconsistent with other substantial evidence in the record.  In
> order for an attending physician's opinion to be rejected, the claim file must
> include specific reasons why the opinion is not well supported by medically
> acceptable clinical or diagnostic standards and is inconsistent with other
> substantial evidence in the record.

10  CSA, ¶ 3D (emphasis added).[8]  The Court also will take account of the inherent difficulty of

11  providing objective medical "evidence" of pain and its effect on an individual's ability to

12  perform certain job-related functions.  As the Ninth Circuit has observed, "individual reactions to

13  pain are subjective and not easily determined by reference to objective measurements."  *Saffron*

14  *v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 872 (9th Cir. 2008).  Indeed, in

15  *Saffron*, the court suggested that an insurer, by demanding objectively verifiable evidence of

16  pain, might be requiring "evidence that simply is not available."  *Id*. at 873 ("[P]ain is a

17  completely subjective phenomenon and cannot be objectively verified or measured." quoting

18  *Fair v. Bowen*, 885 F.2d 597, 601 (9th Cir. 1989) (internal quotation marks omitted)).

19      **1. Disability in 2003**

20      Upon considering the evidence available to UNUM at the time it reviewed the denial of

21  Galvin's initial claim, the Court discerns numerous and substantial indications that Galvin was

22  disabled from the time she filed her claim through early January 2004, when she returned to

23  work.  *See supra* Section I.  At the same time, the Court recognizes that the largely subjective

24  nature of pain placed UNUM in a difficult position as the gatekeeper of plan assets.  In that

25  respect, UNUM has identified a series of discrete facts on the basis of which it questioned the

26  _____

27      [8] UNUM argues that the Court may not refer to the settlement agreement, which UNUM
    claims is inadmissible for any purpose.  The CSA, however, states that its contents "shall be

28  inadmissible for any purpose in any proceeding *unrelated to enforcement of the terms of this
    CSA*."  Ex. 2 to Pl.'s Mot. for Summary Judgment, at 2.

1  legitimacy of Galvin's claim.  In somewhat simplified terms, UNUM claims that Galvin's

2  difficulties lay not with her experience of pain, but with other life circumstances, and that her

3  purported effort to hide those circumstances from UNUM further supports the inference that her

4  claim for disability benefits was unfounded.  UNUM first contends that Galvin omitted "critical

5  portions" of her medical records in an attempt to conceal evidence of depression and work-

6  related difficulties.  In fact, the record does reveal that Galvin omitted certain portions of her

7  medical file.  In the case of Dr. Lee's treatment notes, Galvin blacked out portions of the notes

8  pertaining to her ongoing depression.  While this was questionable, Galvin cannot be faulted

9  entirely for believing that the information was irrelevant to whether the record contained

10  sufficient evidence of *pain* to support her claim for disability.  Moreover, the ease with which

11  UNUM ultimately satisfied itself that Galvin's difficulties were caused by depression or work-

12  related problems–without any insight into Galvin's mental condition, and without a shred of

13  evidence or the slightest knowledge of her work environment–makes it quite understandable that

14  Galvin might fear that evidence of depression or difficulty at work would doom her claim.[9]  More

15  to the point, Dr. Lee expressly clarified to UNUM that he "never" thought Galvin's pain was

16  either not real or caused by her work environment, and that her work environment merely

17  exacerbated her "predominant injuries[,] [which] were myofascial in nature."  AR 552.  He

18  described her depression as "stable" and "not [directly] an issue in her disability."  AR 554.

19  UNUM also faults Galvin for failing to disclose Dr. Manber's confidential therapy notes,

20  which purport to record that around the time Galvin filed her initial claim for disability benefits,

21  she received a "negative employment review suggesting she should start looking for alternative

22  employment" and "fe[lt] . . . she [was] facing a hostile work environment."  Def.'s Opp. at 3:4-6.

23  However, the cited portions of Dr. Manber's notes reveal that Galvin had received a "review

24  which appears to be preparation for layoff *not related to actual performance*."  AR 265

25  _____

26  [9] UNUM also claims that Galvin "oversaw the submission" by Dr. Turchin of
contradictory release to work orders.  An examination of these orders, however, reveals few

27  differences in the restrictions imposed, all of which pertained in some form to Galvin's

28  experience of increasing pain in connection with extended sedentary periods.  *Compare* AR 556-58, *with* AR 559-61.

1  (emphasis added).  In any event, even assuming that the allegedly poor review *was* related to

2  Galvin's performance,[10] UNUM has pointed to no evidence to rebut the obvious inference that

3  her diminished performance level was caused by the debilitating pain she was experiencing.

4  Indeed, UNUM ignores a performance review of Galvin conducted prior to the onset of her pain,

5  which stated that she was "extremely bright and well respected by her colleagues[,] . . . [had]

6  demonstrated excellent skills in handling tax dispute matters[,] . . . performed very well in a

7  range of other tax counseling matters[,] . . . and [was] viewed as an important part of the

8  Department's future."  AR 1476.  UNUM also ignores the fact that Galvin's productivity

9  declined markedly through 2002, during which time the amount of sick leave she claimed also

10  increased significantly.  As Dr. Britton later observed, Galvin's "past history of high achievement

11  argues strongly against [her symptoms] being anything other than what [they] appear[] to be, that

12  is a condition which came on and which has a relationship to her Ehlers-Danlos syndrome and

13  which is at this time going to be a permanent fixture of her life."  AR 1672.

14      UNUM next observes that Galvin alleged in a wrongful termination lawsuit filed against

15  Heller Ehrman that she remained able to work with accommodations.  UNUM treats these

16  allegations as further evidence that Galvin was not actually disabled, but UNUM's argument

17  rests on the flawed premise that "there [is] a logical incompatibility between working full time

18  and being disabled from working full time."  *Hawkins v. First Union Corp. Long-Term Disability*

19  *Plan*, 326 F.3d 914, 918 (7th Cir. 2003).  Similarly, Galvin is not to be faulted for pursuing all of

20  her legal options when the nature of her condition was such that an employer easily could find

21  that her performance was inadequate as a result of her pain, while an insurer could find that she

22  was not disabled.  In fact, this appears to have been precisely what occurred in this case.

23      In a similar vein, UNUM claims that Galvin "actively sought employment" during her

24  disability leave in 2003.  UNUM again relies on Dr. Manber's therapy notes, which refer

25  generally to Galvin's "job search" and to a job interview for which she purportedly sat in New

26

27  ───────────────

[10] The record is unclear on this point.  However, in a settlement statement entered in
connection with Galvin's wrongful termination action against Heller Ehrman, the firm noted that

28  Galvin received a negative performance review in December 2002 indicating that "her job was in
jeopardy unless her performance improved."  AR 704.

Case No. C 07-5195 JF (RS)
ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT
(JFLC3)

1   York.  As noted above, however, in her appeal of UNUM's claim denial, Galvin provided cell

2   phone records in support of her claim that she was not in New York when she was alleged to

3   have been interviewing for a job, and that she did not interview for a job at all during the two

4   months identified by UNUM.  AR 338, 359-72.  Although the evidence submitted by Galvin

5   does not entirely rule out the possibility that she looked for a job at some point during her 2003

6   disability leave, Dr. Manber's notes, upon which UNUM relies so heavily, record Galvin's

7   contemporaneous belief that she might be able to hold a job as an appellate research attorney.

8   That Galvin claimed she was disabled from working as a corporate tax attorney but nonetheless

9   believed she might be able to work in some other capacity does not undermine her claim for

10  benefits under her employer's plan.

11        While the Court recognizes that "physicians naturally tend to support their patients'

12  disability claims, and . . . may bring [bias] to the disability evaluation," *Hawkins*, 326 F.3d at 917

13  (internal quotation marks and citation omitted),[11] it concludes, after carefully considering the

14  record, that UNUM's concerns were unfounded, and that the consistent opinions of Galvin's

15  treating physicians and Galvin's own account of the effects of her pain should have been taken at

16  face value.  The conclusion that Galvin's pain rendered her disabled within the meaning of the

17  plan–i.e., unable to earn at least 80% of her Own Occupation Income Level or to perform each of

18  the material duties of her specialty in the practice of law–is supported by the contemporaneous

19  medical conclusions of Dr. Lee, *see* AR 486, the evidence that Galvin had suffered herniation in

20  multiple vertebral discs, *see* AR 175, 234-36, and Galvin's own detailed account of the pain she

21  was experiencing.  A finding of disability also is supported by mutually corroborative

22  retrospective assessments of Galvin's 2003 condition by Dr. Lee and Dr. Turchin.  *See* Report of

23  Dr. Lee, dated January 23, 2004, AR 337-38 (reiterating that Galvin was disabled during 2003 as

24  a result of musculoskeletal and neurologic conditions); Letter of Dr. Turchin, dated March 19,

25  _____

26        [11] Of course, "[i]f the incentives of the treating physician [to help the patient] and of the
    plan's [medical] consultant are assumed to be equal and opposite, consideration of incentives

27  drops out and the superior information likely to be possessed by the treating physician, especially
    when as in this case the consultant does not bother to examine the patient, may support [a]

28  treating-physician presumption." *Hawkins*, 326 F.3d at 917.

18

1   2004, AR 598 (explaining that by the last few months of 2002 and into 2003, Galvin's injuries

2   "had worsened to the point where they impaired her ability to work and even to concentrate," and

3   that while under treatment during the 2003 disability period, Galvin's neck injuries "caused her

4   to suffer debilitating headaches that radiated up into the back of her head, [and that] . . . . were

5   triggered by, among other things, sitting for any length of time, using her right arm or moving her

6   shoulder repeatedly"). *Cf. Woo v. Deluxe Corp.*, 144 F.3d 1157, 1162 (8th Cir. 2008), *abrogated*

7   *on other grounds by Metro. Life Ins. Co., v. Glenn*, __ U.S. __, 128 S.Ct. 2343 (2008) (finding

8   that purported evidence of no disability was "further diluted by the retrospective disability

9   determinations" provided by the plaintiff's treating physicians).

10      **2. Disability after May 2004**

11      UNUM did not make an express medical or functional finding with respect to Galvin's

12  entitlement to disability benefits after May 10, 2004, claiming instead that she was subject to the

13  plan's "preexisting condition" exclusion because her "covered person" status ceased during her

14  2003 leave of absence. UNUM's determination was incorrect for several reasons. The plan

15  provides that an employee will not be eligible for benefits if he or she "received medical

16  treatment . . . in the three months just prior to your effective date of coverage[,] and the disability

17  begins in the first 12 months after your effective date of coverage." As UNUM argues, because

18  Galvin was not at work between January 14, 2003 and January 13, 2004, she could qualify as a

19  covered person under the plan only if, during that period, she was (1) disabled, (2) subject to a

20  lay-off, (3) involved in a labor dispute, or (4) on a leave of absence under the federal Family and

21  Medical Leave Act. UNUM argues that Galvin did not fall into any of these categories, and that

22  therefore she did not resume "covered person" status under the policy until she returned to work

23  on January 4, 2004. However, because Galvin *was* disabled in 2003, she remained covered

24  despite her absence from work.[12] In addition, under the terms of the plan, the preexisting

25

26      [12] If Galvin's disability is viewed on a continuous basis, her further request for benefits is
       authorized by a provision in the plan entitled Temporary Return to Active Work Allowable
27      Periods. It states that:

28          If you temporarily return to Active Work during a Benefit Period, the following
           will apply: a. the allowable period of a temporary return to Active Work may not

                                        19

1   condition exclusion applies only if the Date of Disability occurs within the Pre-existing

2   Exclusion Period, which the plan defines in Galvin's case as "the first 12 months as a Covered

3   Person." AR 2428, 2438. Since Galvin had been a Covered Person since 1996 when she first

4   accepted employment at Heller Ehrman, AR 1665, the pre-existing condition exclusion does not

5   apply to her.

6          Turning to the evidence of post-2004 disability, the Court has undertaken a searching

7   review of the record and, while it acknowledges several of UNUM's misgivings about the nature,

8   timing, and content of the evidence, it is convinced that Galvin was and is disabled within the

9   meaning of the plan, and that the cause of her disability was the same as in 2003. The evidence

10  consists largely of the medical examination reports of Drs. Mantalbano, Madireddi, and Britton,

11  which were compiled, respectively, on May 18, 2005, June 8, 2006, and March 2, 2007. All

12  three physicians concluded explicitly that Galvin was experiencing fluctuating but substantial

13  pain that prevented her from working productively for long enough periods to meet the variable

14  and often intense demands of her job. *See* AR 692-700 (report of Dr. Mantalbano); 732-33

15  (report of Dr. Madireddi); AR 1669-72 (report of Dr. Britton). The Court now addresses

16  UNUM's objections to the credibility and relevance of this evidence.

17         As an initial matter, UNUM notes that the evidence of continuing disability consists not

18  of observations by Galvin's treating physicians, but of examination reports obtained in the course

19  of related litigation that Galvin was pursuing against Stanford, for alleged privacy violations, and

20  against Heller Ehrman, for wrongful termination. UNUM also points out that none of the reports

21  is contemporaneous or near-contemporaneous with the start of Galvin's second period of

22  disability. The reports therefore might be viewed merely as evidence of some intervening

23  disability, one of an unknown cause, and which potentially began after Galvin's plan coverage

24

25         exceed a total of 180 days; and b. if after having returned to Active Work, you
        become disabled again from the same or related cause or causes and your return to
26      Active Work did not exceed the allowable period described above, then *your*
        *Disability will be considered a continuation of the Benefit Period*.
27  AR 2433 (emphasis added). Galvin returned to work in early January 2004 and stopped working
28  on May 2, 2004, when the severity of her symptoms increased. Galvin's "active work" time is
    well within the 180 day recurrent disability period set forth in the plan.

                                              20

1  ceased upon her termination by Heller Ehrman.  Finally, UNUM draws special attention to a

2  statement in Dr. Mantalbano's report that Galvin's "[i]nitial injury [had] resolved" as of July

3  2004, and that she had "returned to pre-injury status."  *See* AR 698-700.  UNUM argues that

4  Galvin's "pre-injury status" was that of January 2004, when her doctors cautiously released her

5  to work.  UNUM therefore contends that later medical evaluations are irrelevant to whether

6  Galvin was under a continuing disability in 2004, or at any time while she was an employee of

7  Heller Ehrman and therefore covered by its ERISA plan.

8          Despite UNUM's understandable concerns, a close reading of the medical evidence

9  indicates that Galvin continued to experience serious pain on an intermittent basis, and that the

10  pain prevented her from performing essential functions of her position, such as meeting

11  unpredictable deadlines in an intensive litigation setting and working the number of hours

12  expected by her employer.  First, by 2004, Galvin's experience of pain, and the causes of that

13  pain, were documented extensively in her medical file.  Each of the three independent medical

14  examiners carefully reviewed those files and, after conducting separate physical examinations of

15  Galvin, reached substantially the same conclusions about the nature and extent of her pain.  *See*

16  AR 695-698 (Dr. Mantalbano); 725-26 (Dr. Madireddi); 1669 (Dr. Britton).  Each of the

17  examiners also "connected the physical problems that [Galvin] experienced during the insured

18  period to her eventual diagnosis" of a hereditary connective tissue disease, likely Ehlers-Danlos

19  Syndrome, *see* AR 698 (Dr. Mantalbano); 730 (Dr. Madireddi); 1669-72 (Dr. Britton).  *Cf. Woo*,

20  144 F.3d at 1162.  Viewed in that light, further contemporaneous documentation of Galvin's pain

21  by her treating physicians would have been largely redundant, and its absence from the record is

22  not particularly concerning.

23          Second, UNUM mischaracterizes Dr. Mantalbano's report, which in fact does not suggest

24  any discontinuity or inconsistency in the nature or extent of Galvin's disability.  While the report

25  states that Galvin's "[i]nitial injury [had] resolved," and that she had "returned to pre-injury

26  status," it is clear that Dr. Mantalbano was referring solely to the specific aggravation of Galvin's

27  condition that occurred in May 2004.  *See* AR 698-700.  UNUM ignores the overarching

28  conclusion of the report that Galvin suffered from a permanent disability that prevented her from

21

1  meeting the unpredictable demands of her job on a consistent, long-term basis.  That

2  determination was based on Dr. Mantalbano's extensive review of the record and a separate live

3  physical evaluation of Galvin.  AR 693-700.  Similarly, while UNUM emphasizes that at the

4  time of the examination Galvin complained only of "[c]onstant slight to less than moderate right

5  sided neck, upper back and upper right arm . . . pain which she rates as a 5 on a subjective pain

6  scale," it was a well-documented fact that Galvin's experience of pain was subject to

7  considerable fluctuation.  *See* AR 699 (Dr. Mantalbano, summarizing previous observations);

8  724 (Dr. Madireddi).  The report also makes explicit that Galvin's then-current condition was the

9  same one that has afflicted her since the 2001 motor vehicle accident, and that it was subject to

10  recurrent aggravation that interfered with Galvin's ability to do her job.  AR 698-99.  Drs.

11  Madireddi and Britton reached essentially the same conclusion.  See AR 725-30 (Dr. Madireddi);

12  1669-72 (Dr. Britton).

13       If there is any lingering doubt that Galvin's recurring pain prevented her from performing

14  certain essential duties of a tax lawyer in a large law firm setting, Heller Ehrman's own

15  assessment of Galvin's performance should dispel it.  In a settlement statement entered in

16  connection with Galvin's wrongful discharge action, the firm stated that

17       Galvin's back and neck problems ma[de] it impossible for her to perform the
       essential duties of her job even with reasonable accommodation. . . . After Galvin
18       returned to work in 2004, Heller Ehrman acknowledged every restriction her
       doctor prescribed for her and she nevertheless became further injured by working
19       the hours necessary to meet a litigation deadline.

20  AR 705.  While Heller Ehrman's statement no doubt is self-serving, it nonetheless is evidence of

21  the ultimate fact that Galvin could not meet the demands of her job as her employer defined

22  them.  There is no surprise in the firm's contention that "[o]ne of the essential functions of

23  Galvin's job as a tax litigator at Heller Ehrman was to meet litigation deadlines, which can be

24  unpredictable and immediate."  AR 705.  The firm's swift reconsideration of Galvin's

25  partnership eligibility when her performance faltered with the worsening of her pain, *see* AR 704,

26  1476, only confirms that Galvin's ability to perform the essential functions of a tax litigator had

27  been compromised.

28

Case No. C 07-5195 JF (RS)
ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT
(JFLC3)

### 3. Findings of fact and conclusions of law[13]

Based on the foregoing determinations with respect to each item of evidence in the record, and pursuant to Federal Rule of Civil Procedure 52, the Court finds that Galvin suffered debilitating pain between January 8, 2003 and January 4, 2004 that rendered her unable to earn at least 80% of her Own Occupation Income Level or to perform each of the material duties of her specialty in the practice of law.  The Court therefore concludes that Galvin was disabled within the meaning of the Heller Ehrman plan during that period and is entitled to benefits.  The Court also finds that Galvin suffered a re-aggravation of her condition in May 2004, and that despite her recovery from that specific aggravation by July 2004, she remained disabled, in that her fluctuating but often elevated pain levels required restrictions and limitations inconsistent with the demands of her job as a tax attorney.  Accordingly, the Court concludes that Galvin was disabled within the meaning of the plan as of May 2004, and continues to be so.

## IV. CONCLUSION

For the foregoing reasons, judgment will be entered in Galvin's favor.  If the parties are unable to agree as to the method of calculating the benefits owed to Galvin, including any interest or applicable offsets, the Court will hold a further hearing for that purpose.  In that event, the parties are directed to determine a mutually convenient hearing date, and to reserve that date with the Court's calendar clerk.

**IT IS SO ORDERED.**

DATED: 7/17/09

_____
JEREMY FOGEL
United States District Judge

---

[13] Although the parties moved for summary judgment, they also agreed to a bench trial on the administrative record.

23

1    This Order has been served electronically upon the following persons:

2    John C. Ferry     john.ferry@wilsonelser.com

3    Scott D. Kalkin , Esq     robokalk@earthlink.net

4    Thomas M. Herlihy     thomas.herlihy@wilsonelser.com

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28